HOWARD WATCH CO. v. H. BEDILLION ET AL.

WM. RODGERS MFG. CO. v. H. BEDILLION ET AL.

SIMPSON, ET AL., v. H. BEDILLION ET AL.

FALKMAN, ET AL., v. H. BEDILLION ET AL.

APPEALS BY DEFENDANTS FROM THE COURT OF COMMON PLEAS NO. 2 OF ALLEGHENY COUNTY.

Argued November 11, 1889—Decided January 6, 1890.

1. Where a wife in good faith takes a judgment from her husband for an amount which she at the time believes to be due to her, the judgment may be maintained against her husband's creditors, even though it may be in excess of the amount actually due: Meckley's App., 102 Pa. 536.
2. In such case, it is error for the court to charge that if the judgment was in excess of the amount actually due, and the wife ought to have known it, or there was reasonable ground for her knowing it, she could be visited with the fraud of her husband.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS, MC-COLLUM and MITCHELL, JJ.

Nos. 75, 76, 77, 78 October Term 1889, Sup. Ct.; court below, Nos. 189, 212, 191 April Term 1887, and No. 43 July Term 1887, C. P. No. 2.

To the numbers and terms, respectively, in the court below, writs of execution attachment were issued by the Howard Watch & Clock Co., the Wm. Rodgers Manufacturing Co., Simpson, Hall, Miller & Co., and Falkman, Oppenheimer & Co., upon judgments held by them, respectively, against T. P. Bedillion, in which writs Mrs. Hannah Bedillion, the wife of

Charge of Court below.

the judgment defendant, and J. U. Rose, trustee for her, were served as garnishees. Answers of the garnishees having been filed, the causes were put at issue under the plea of nulla bona.

The facts made to appear at the trial of the cases together on December 20, 1888, sufficiently appear in the charge to the jury, WHITE, J.:

The plaintiffs' claims are based upon execution attachments. Having obtained judgments in court, they issued executions, and finding no property that could be levied upon directly, as the property of the defendant, they served what are called attachments, upon Mr. Rose, who was acting as trustee for Mrs. Bedillion, and upon Mrs. Bedillion, attaching whatever property or money might be in their hands belonging to her husband, Thomas P. Bedillion. The defendants deny that they have any property belonging to T. P. Bedillion, or that they have any money belonging to him. The issue is, whether the property that Rose bought at sheriff's sale, and the money he realized from that, belong to Mrs. Bedillion, or whether they are properly the money and property of T. P. Bedillion. In other words, as Rose claims to be acting as trustee for Mrs. Bedillion in those judgments upon which executions were issued and the property sold, the question is whether the judgments were valid judgments. If they were not valid judgments, then the sheriff's sale on them amounts to nothing, and the property, or the money realized from it, would be subject to these execution attachments, and should go, as far as necessary, towards paying them.

As I said, the issue here really is, are those judgments honest judgments? That is the first question. Did Bedillion owe his wife the amount of those judgments?

Mrs. Bedillion claims on three judgment notes, that were given her by her husband, one in November, 1884, for $20,000; one in July, 1886, for $5,000; and one in January, 1887, a day or two before these judgments were entered up, for something over $5,000. At the time the judgments were entered in court, on January 5, 1887, counting the interest on the various judgment notes, the total claim was something over $36,000. The sheriff sold out Bedillion's store, and his return shows that the whole of the property levied upon, sold for a little over

$14,000. After deducting costs, and perhaps some other things connected with the sale, Rose, the trustee of Mrs. Bedillion, received from the sheriff a few cents less than $12,000. He afterwards received on collections from debtors of Bedillion, on execution attachments, and some bills that were paid, not covered by the execution attachments, over $3,800. In the neighborhood of $750 of that amount was collected on bills due to Bedillion not covered by the execution attachments. So that altogether the trustee received nearly $16,000. He bought the property at sheriff's sale, and afterwards carried on the business, as he said, as trustee for Mrs. Bedillion. We have nothing to do with anything that occurred after the sheriff's sale; I mean, with reference to the disposition of the property or what money was made from it. Our attention must be confined to the time these various notes were given, and the time the executions were issued, on January 5, 1887.

[Counsel for plaintiffs contend very strongly that these various judgment notes were given for more than was due Mrs. Bedillion; and it is pretty difficult to believe from the evidence in the case that those amounts were actually due to Mrs. Bedillion. I say, it is very difficult to figure out, from the evidence we have, that those sums were actually due by her husband to her at the time these various judgment notes were given. Mrs. Bedillion, in her own testimony, speaks about the $20,000 note given in November, 1884, and she could only account for in the neighborhood of $15,000, due her at that time. I think she said, substantially, that her husband gave her that note, saying that that would cover the $15,000, and anything else that he might owe her. I do not know that she definitely explained what went in as the consideration of the second note, of $5,000, given in July, 1886. As to the last note, given a few days before the judgments were entered up and executions issued, she does not pretend to say what went into that, but she says it was counted up in the lawyer's office; that her husband was there, and he and Mr. Barton, her lawyer, figured out that the judgment note should be for a little over $5,000.] [1]

Plaintiff's counsel have candidly admitted that there might have been in the neighborhood of $20,000 altogether due Mrs. Bedillion. They have admitted that, in order to avoid one question that might possibly arise, and that is, that Rose, as her

trustee, did not receive more than the amount honestly due to Mrs. Bedillion. But the defendant's counsel contend for the whole amount; that these judgment notes were given for the actual amount due at the time they were given. That is the position of the trustee here to-day, and the position of Mrs. Bedillion all along. . . . .

The first question, gentlemen, then for you to pass upon is this: Were these judgment notes given for more than was due Mrs. Bedillion at the time they were given? If you find that they were, then you pass to another question. But if you find that these amounts were honestly due to Mrs. Bedillion, at the time the judgment notes were given, that is the end of the plaintiff's case, and your verdict ought to be for the defendants in each case. But if you find that the notes were in excess of the amount due to Mrs. Bedillion, then you pass to another question, viz.: If they were in excess, how came they to be in excess; was it a mere mistake on the part of Mr. Bedillion, or was it done with a fraudulent purpose? I have said that even if he gave the notes for more than was actually due to his wife, and even if he contemplated a fraud at the time, yet if his wife took those notes in good faith, honestly believing that these sums were due from her husband to her, she would not be visited with the fraud of her husband; and that really, gentlemen, is the main point I think in this case: Was his wife acting in good faith when she took these various judgment notes? Did she take them honestly believing that her husband owed her those sums?

A wife is justified in reposing a great deal of confidence in her husband. It is hardly to be expected that wives will be as strict and as exacting in their dealings with their husbands, as they would be with strangers. And yet they are bound to act honestly, and they must act in good faith. A wife has no right to take a judgment note from her husband for more than he owes her; and she ought not blindly to take a judgment note when her husband is in business, knowing that he is dealing with the world, and may owe other persons who may be affected by it. She has no right blindly to take a judgment note from her husband and just say, " Well, he told me this is the amount that was due me and I believed him." . . . .

[I do not think, as counsel has said, Mrs. Bedillion intended

to perpetrate a fraud, or intended to become a party to a fraud; yet she may, by her carelessness, become a party to the fraud of her husband, and in that way, a party to a fraud upon other honest creditors. If she knew that these judgments were large and might affect other creditors, and she knew enough to put her on inquiry and make her examine into it, and she did not do it, then she is presumed to have known what she ought to have known under the circumstances. If, therefore, you find that these judgment notes were in excess of the amount Bedillion owed his wife, and that she knew that fact, or ought to have known it, that there was reasonable ground for her knowing it, then she is visited with the fraud of her husband, and these judgments must stand aside for other creditors.] [1] If you find those facts, then you find for the plaintiffs, and your verdict would be for the plaintiffs for the full amount of their claims and costs, because there are ample funds in the hands of the trustee to pay them, or ought to be. Whether he has kept the money or paid it away, is immaterial.

The court is requested by the plaintiffs to instruct the jury:

2. If the judgment notes given to J. U. Rose as trustee of Mrs. Bedillion, were for a larger sum than was actually due at the time from her husband to her, and she knew, or had reasonable cause to believe, that such was the fact, the plaintiffs are entitled to recover.

Answer: Affirmed.[2]

The court is respectfully requested to charge on behalf of the defendants:

1. That the undisputed evidence is that Mrs. Bedillion loaned a large amount of money to her husband, exceeding in amount the total receipts of her trustee from sales. If the jury believe this evidence, their verdict should be for the defendants.

Answer: Refused, because of the question of fact submitted to the jury under plaintiffs' second point.[3]

3. That if the jury believe from the evidence that Mrs. Bedillion honestly believed that her husband owed her the amount called for by the notes, the verdict should be for the defendants, even though there might be a mistake in the amount.

Answer: This is affirmed, if there was simply a mistake in the amount; but if T. P. Bedillion fraudulently gave the notes to his wife in excess of the real sum due her, then the question

arises, presented by plaintiffs' second point, whether his wife knew, or had reasonable cause to believe, they were in excess of the actual amount due.[4]

5. That under all the evidence the verdict should be for the defendants.

Answer: Refused.[5]

The jury returned verdicts as follows: In favor of the E. Howard Watch & Clock Co., for $426.27; in favor of the Wm. Rodgers Mfg. Co., for $1,845.22; in favor of Simpson, Hall, Miller & Co., for $486.17; in favor of Falkman, Oppenheimer & Co., for $1,698.21. Rules for a new trial having been discharged, judgments were entered, when the garnishees took these appeals, assigning for error:

1. The portions of the charge embraced in [ ][1]

2. The answer to the plaintiffs' point.[2]

3–5. The answers to the defendants' points.[3 to 5]

*Mr. W. K. Jennings* (with him *Mr. R. D. Wilson*), for the appellants.

Counsel cited: Meckley's App., 102 Pa. 536.

*Mr. J. M. Stoner* (with him *Mr. J. S. Ferguson*), for the appellees.

Counsel cited: Mast's App., 40 Pa. 24; Bachman v. Killinger, 55 Pa. 416; Davis v. Charles, 8 Pa. 82.

## NO. 75.

OPINION, Mr. JUSTICE GREEN:

After an attentive reading of all the testimony in this case, we fail to discover the least evidence that Mrs. Bedillion had anything to do with any fraudulent purpose of her husband in the giving or in the accepting of the judgments in question. That she practically turned over to him everything that came to her from her father's estate; that she intrusted to him most implicitly the entire management of her estate; that she kept no accounts whatever, either of the moneys received by him or the moneys disbursed; and that she had nothing to do with the preparation of the $20,000 note, are entirely uncontroverted facts. After deducting the $10,000 paid for the Smithfield St.

property, from the total amount received from all sources, there does not appear to be any material, if any, deficiency to make up the amount of the $20,000 judgment note, which was given in November, 1884. But, however that might be, unless there was some evidence impugning the good faith of the wife in accepting that judgment, we do not think it could be attacked for fraud on her part. The learned court practically so instructed the jury when they charged them in these words: "I have said that even if he gave the notes for more than was actually due to his wife, and even if he contemplated a fraud at the time, yet, if his wife took those notes in good faith, honestly believing that these sums were due from her husband to her, she would not be visited with the fraud of her husband; and that really, gentlemen, is the main point in this case: Was his wife acting in good faith when she took these various judgment notes? Did she take them honestly believing that her husband owed her these sums?" The court also charged that they did not think Mrs. Bedillion "intended to perpetrate a fraud or to become a party to a fraud," yet added that she might be so by her carelessness, and that if the judgment notes were in excess of the amount actually due, and she "ought to have known it, or there was reasonable ground for her knowing it, she would be visited with the fraud of her husband."

We think this is carrying the doctrine beyond the authorities, especially in view of the undoubted facts in this case. There was not money enough realized to pay the $20,000 judgment, or the amount which was beyond all question due to the wife. As there were three separate judgments, if the first one was certainly free from the imputation of a conscious fraud on the part of the wife, the inquiry as to the others becomes practically unimportant. They were given at different times, nearly two years elapsing between the first and second; and we fail to see how a possible fraud in the second or third could destroy the validity of the first, if it was, on its own merits, free from any imputation of fraud. The accounts which determine the question whether the $20,000 judgment was in excess of the amount actually due are somewhat complicated, and the wife may in the most perfect innocence have been mistaken as to the exact amount due her. That judgment note was given between four and five years before her husband's failure, when it is scarcely

possible to believe that a fraudulent purpose could have been entertained. It has not been made at all clear in the paper-books that in November, 1884, when that judgment note was given, there was not the whole amount of $20,000 actually due from the husband to the wife. The statement of counsel for plaintiffs entirely ignores the $9,116.11 received from Mrs. Bedillion's father by her husband, yet that amount may with perfect propriety, so far as we can discover to the contrary, have been secured by the judgment. Yet if it is included, the amount really due in November, 1884, would seem to be considerably in excess of $20,000. We think the case comes clearly within the principle of Meckley's App., 102 Pa. 536, that even if there were an honest mistake as to the amount actually due, the judgment would not be avoided, although confessed by a husband to his wife. We think the jury should have been instructed that if they believed there was full consideration for the $20,000 note, or that there was a mere honest mistake in fixing the amount, the judgment would not be avoided. We do not see the materiality of the inquiry respecting the other two judgments, and we express no opinion in regard to them. The assignments of error are all sustained.

Judgment reversed, and venire de novo awarded.

NOS. 76, 77, 78.

OPINION, MR. JUSTICE GREEN:

For the reasons stated in the opinion of this court, in the case at No. 75 October Term 1889, the judgments in these cases are severally

Reversed, and new venires awarded.